The People of the State of Illinois, Defendant in Error,
v. Alma Miller, Plaintiff in Error.

Gen. No. 36,404.

Opinion filed February 7, 1934.

SAMUEL R. RABINOFF and ALFRED G. BRILE, for plaintiff in error; ELWYN E. LONG, of counsel.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; OTHO S. FÁSIG and EDWARD E. WILSON, Assistant State's Attorneys, of counsel.

Mr. Presiding Justice Hall delivered the opinion of the court.

This is an appeal from a judgment of the criminal court of Cook county, finding the defendant guilty of the crime of assault with a deadly weapon, and sentencing her to confinement in the common jail of Cook county for a term of 90 days and imposing upon her a fine of $1. The case was heard before the court and a jury, upon an indictment charging defendant with the crime of which she was found guilty.

The record discloses that two deputy sheriffs, Frank P. Rollins and Walter Blyth, on April 29, 1932, were attempting to serve a writ of replevin on defendant and her husband at 1238 West 74th Place in the City of Chicago, the home of defendant. The evidence is to the effect that these officers went to this place, one of them rang the door bell, and that they received no response from the occupants of the house. Rollins testified in substance that the husband of the defendant came out of the basement door and asked the bailiffs what they wanted, and that Rollins then said they were deputy sheriffs, gave Miller two copies of a writ of replevin, and that Miller directed his child who was with him to give these copies to the child's mother, the defendant. Rollins further testified that defendant then opened a window, took the copies and there and then informed the deputy sheriffs that she, defendant, had been advised by her attorney not to allow the deputy sheriffs to enter the house. Rollins further stated that he had informed the Millers who he and the other officer were, and that it was the duty of a deputy sheriff to serve the writs and seize certain furniture, and that Miller then replied: "If anyone goes near the door, we will plug them"; that the police were then called by the deputy sheriffs; that thereafter he, the witness, tried the door of the house and asked defendant to open it, and called to her that they were officers, and in reply, a voice from the inside, which he

afterwards identified as that of defendant, shouted: "I don't care who you are, and I will blow your damn heads off if you come in." This witness further testified that Officer Blyth then informed the witness that the window of the house was open, and that at that time, he, the witness, was standing about two feet from this window, a bay window on the porch, and that at that moment he heard a shot which came through the window; that the shot struck his vest and his index finger, and that afterward his hand was bleeding, and that he saw the defendant at this window standing back of a curtain while the conversation was going on outside of the house.

Walter Blyth, the deputy sheriff who was with Rollins, testified in substance that after the police came he called out that they were officers and demanded admission to the house, and that defendant replied: "I don't care who you are, you are not coming in here. If you come in, I am going to blow your damn heads off." This witness further testified that the window from which the shot was fired was partly open; that it was open enough to enable him to put his fingers under it, and that he had placed his hands under it and had thrown it further up, and that just at that moment a shot was fired through the window from within, which struck and wounded Rollins. The testimony of these two officers is corroborated in most respects by three police officers who were present.

Defendant testified in substance that on the morning of April 18, 1932, about 9:30, she and her husband were in bed sleeping, when she heard a knock at the door; that her husband put on his clothes, went out and did not return; that she called out "get away from that door and don't try to break it down" and that someone from the outside stated that if the door was not opened, he would break it down. Defendant stated that she had a gun in her hand as she went to the front door, and that someone was trying to break open the

window; that the window was almost closed and the shades were down; that she tried to push the window clear down and that at that moment, she had the gun in her hand, and that it exploded; that she never heard anyone say: "Open the door, we are police officers or deputy sheriffs." Defendant further testified that she was not aware of the fact, nor did she hear anyone state, that the persons who were seeking entrance to her dwelling were officers, armed with a writ of replevin; that all she heard was the statement made by someone that unless the door was opened, it would be broken in. She admits that she had the pistol and that a shot was fired, by which Rollins was wounded.

The writ of replevin upon which the officers were attempting to make a levy when the shooting occurred, was offered and received in evidence without objection. It is contended by the defendant that the affidavit upon which the writ issued should also have been before the court. The writ is in the ordinary form, and it will be presumed, until the contrary appears, that the statute requiring an affidavit showing certain facts had been complied with before the writ issued. Further, the law states:

"It is not essential that the writ should disclose the fact that the property to be replevied belonged to plaintiff or had been impounded or distrained; *nor need the writ show that the affidavit required by the statute had been made by plaintiff*. Mere irregularities or informalities will not ordinarily invalidate the writ, and if it is regular on its face, it will protect the officer who serves it because it is his duty to execute such process without investigating the cause of action." (Italics ours.) 54 Corpus Juris, p. 488.

In *Brother v. Cannon,* 1 Scam. (Ill.) 200, the Supreme Court of Illinois said:

"In an action against an officer for an 'escape on process sued out, and placed in the officer's hands to execute, or in an action for a false return, or for a

refusal to execute such process, it is no justification for suffering an escape, or for making a false return, or for a refusal to execute such process, that the forms of law in suing out such process, have not all been observed. *If the process be regular on its face, and it be not absolutely void, having been issued without the authority of law, the officer can never be made a trespasser, although it may have been erroneously issued; and he is bound to execute the process, although it may have been erroneously sued out.* If the magistrate had jurisdiction of the subject matter, the officer was not bound to inquire further into the accuracy of his proceedings, but should have proceeded to obey the mandate of the warrant. In a case in England, (1) Kenyon, Chief Justice, says: *'It is incomprehensible to say that a person shall be considered a trespasser who acts under the process of the court.'* '' (Italics ours.) See also *People v. Mines,* 164 Ill. App. 658.

The briefs here are of slight assistance.

The only question presented for review is, whether or not, under the evidence adduced, defendant was justified in shooting the officer, as he with another officer was attempting to enter her house in the manner described by the evidence for the purpose of serving a writ in a civil proceeding.

The evidence of moment is to the effect that the window through which an entrance was attempted was partly open, and that Deputy Blyth was in the act of pulling it further up when defendant shot through the window and struck and injured Deputy Rollins. The officers both testified that defendant was fully apprised of their purpose in seeking an entrance to her home, and of the fact that they were armed with a legal process, and appellant's brief does not suggest that she was not so apprised.

Counsel for defendant cites *Snydacker v. Brosse,* 51 Ill. 357, where suit was brought against a constable

who was attempting to serve an execution, in which it is charged that a wrongful entry to her home was made by the constable, and that he, the constable, abused his power after entrance was made. In its opinion, the court states that the constable forced an entry through a door or window to obtain entrance, and said:

"It is a uniformly recognized rule of the common law, that no officer has the legal authority to break an outer door, or other outside protection to an individual's house, for the purpose of executing civil process. Even to arrest a defendant on civil process, the officer must corporally seize or touch the defendant's body, and thus render him a prisoner, before he can justify the breaking and entering the defendant's house to retake him; otherwise, he has no such power, but must watch his opportunity to arrest him; for every man's dwelling house is looked upon by the law as his castle of defense and asylum, wherein he should suffer no violence. 3 Black. Com. 288. And in the execution of civil process against the goods of a defendant, an officer is equally powerless to force an entrance into the house of the defendant for the purpose of seizing them. Blackstone says, a sheriff may not break open any outer doors to execute either a *fieri facias* or a *capias ad satisfaciendum;* but he must enter peaceably, and may then, after a request and refusal, break open any inner doors belonging to the defendant, in order to take the goods. 3 Bl. Com. 417. And what is said of these writs is believed to be true of all civil process; and it follows, that the writ of *retorno habendo* conferred no right on any constable to break an outer door or a window to effect an entrance into appellee's house. On a warrant for the arrest of a person charged with a felony it is otherwise, as the officer may then break open doors, if necessary, to make the arrest. 4 Bl. Com. 292."

Upon the authority of that case, counsel for defendant urges that the court erred in giving the following instruction:

"The court instructs the jury that a duly-authorized process-server has a right to serve the process of the court peaceably and without use of force and without making a forcible entry. He has a right to demand admittance and to execute a replevin writ. He has a right to enter through a door that opens without force or through a window partly open without breaking or force."

In *Palmer v. King*, L. R. A. 1916 D 278, 41 App. D. C. 419, suit was brought for alleged breach of a covenant in a bond given by a surety company conditioned that the marshal of the District of Columbia and his deputies would faithfully perform all the duties of their respective offices. In that case, a deputy marshal, seeking to serve a writ of replevin, rang the bell of the basement of a house to which he sought admission. Plaintiff, a woman, appeared at an open window and suggested to the marshal that her husband was absent, and that he, the marshal, should deliver the papers to her. The marshal thereupon attempted forcibly to climb through the window. Plaintiff resisted such attempt, and it was claimed that in forcing his way through the window into the room, and after he had entered, the officer assaulted the plaintiff, and that she was thereby injured. On appeal from a judgment for plaintiff, the court said, among other things:

"The rule of the common law in respect to the execution of the writ of replevin, as disclosed in Semayne's case, has been approved in many English cases. In *Lee v. Gansel*, Cowp. pt. 1, p. 1, Lord Mansfield, after holding that the entrance of an officer through an open outer door or window to execute civil process must be quiet and peaceable, said: 'The sound

maxim of policy is this, ''that a greater evil should be avoided for a less, and that a less good should give way to a greater.'' The outer door, therefore, or window of a man's house, says the law, shall not be broken open by process. This has been long and well understood. The ground of it is this: that otherwise the consequences would be fatal; for it would leave the family within naked and exposed to thieves and robbers. It is much better, therefore, says the law, that you should wait for another opportunity than do an act of violence which may probably be attended with such dangerous consequences.'

''The rule of the common law, as deduced from the cases, seems to be that an officer, in executing a writ of replevin, may not break an outer door or window of a dwelling to gain entrance to seize the property of the occupant or of a person rightfully domiciled therein. *He may enter either an open outer door or window, provided it can be accomplished without committing a breach of the peace;* he may then, after a request and refusal, break open any inner doors belonging to the defendant, in order to take the goods. 3 Bl. Com. 417; Semayne's case, 5 Coke 91, 1 Smith, Lead. Cas. 238.'' (Italics ours.) In that case, the judgment was affirmed upon the ground that the officer committed a breach of the peace.

There is no evidence of a breach of the peace by the officers here. Under the evidence adduced, the court was not in error in giving the instruction complained of.

Error is also assigned by defendant because of the refusal of the court to give the following instruction tendered by defendant:

''A person may repel force by force in defense of person, property, life or habitation against one who manifestly intends or endeavors by violence or surprise to commit a known misdemeanor or felony, or

either, or to do great bodily injury to her person, or to enter her home by force or violence, and the danger which would justify the defendant, if the act is aimed against her, may be either real or apparent; and the jury are not to consider whether the defendant was in actual peril of her life or property, but only whether the indications were such as to induce a reasonable woman to believe that she was in such peril of person or property. And if she reasonably believed, and had sufficient cause to believe, and committed the act complained of under such belief, even though it should appear that the injured was not armed, you should acquit the defendant.'' This instruction is offered upon the theory that defendant had reason to believe that an unlawful assault was about to be committed upon her, and that she was, therefore, justified in shooting the officer. There is nothing in the evidence which indicates such an intent by the officers. It was not error to refuse it. The officer might have been killed by defendant, and defendant could then just as reasonably have pleaded justification, as she attempts to do under the circumstances here present, and the question as to whether or not she was justified in firing the shot which wounded him is the same whether he was killed or wounded, and her culpability, or lack of it, is the same in either case. In firing the shot which wounded Rollins, *defendant's* intent was determined by her act. The statute (Cahill's Rev. St. ch. 38, ¶ 345) defines justifiable homicide as follows:

"Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous man-

ner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge.''

Cahill's Rev. St. 1933, ch. 38, ¶ 346, provides:

''If a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given.''

In *People v. Mines,* 164 Ill. App. 658, the defendant was indicted for an assault upon a constable, who was endeavoring to serve a writ of restitution upon the defendant. Trial was had and defendant was sentenced to imprisonment for six months in the county jail, and to pay a fine and costs of the suit. The facts in that case are substantially as follows: A judgment was obtained against defendant in a forcible detainer suit, a writ of possession was issued by the magistrate directed to the sheriff or any constable of Lake county, commanding them to dispossess the defendant. The writ was delivered to a constable to serve upon the defendant, together with a notice to vacate. Thereafter, the constable, with the writ, went to the house of the defendant with an assistant, knocked on the front door and demanded admission. Defendant appeared at an upstairs window and the constable told defendant he had a writ of possession, and requested

him to come down and let the parties in, which request defendant refused to comply with, and thereupon the constable said to defendant, "If you don't come down and open the place, I am coming in," to which defendant replied, "If you do, there will be a funeral," and in reply to this statement the constable stated, "Well, if we have one funeral, we will have two." Thereafter, the constable went to a back door of the house and found the door fastened by a chair being placed against it on the inside. The constable pushed the door open until he reached the chair and removed it, then opened the door and entered the house. He started for a stairway leading upstairs, and defendant, who was about 16 feet away, discharged a shotgun and about 43 shots lodged in the constable's leg. On appeal, error was assigned on the refusal of the trial court to give certain instructions offered by the defendant, and the court said:

"Plaintiff in error's refused instructions 24 and 25 were offered on a theory that Peterson and his assistants were, while executing the writ of restitution, engaged in an unlawful assault upon the habitation of plaintiff in error. As the evidence clearly discloses that they were acting within the authority conferred upon them by the writ, and in discharge of a duty imposed upon them by law, the refusal of the instructions was not error." In that case, in commenting upon the question as to whether or not the defendant could have raised the question as to the sufficiency of the writ, when upon its face it indicated that it was properly issued and thereby justify his assault on the officer, the court said: "But again, even if the judgment was defective and that defect would give the defendant in the writ a right to resist, it would give him no right to kill the officer, where there has been no violence used against his person. Criminal Code, Sec. 148." (Defining justifiable homicide.) In this case, the officer was attempting to serve a writ, which he was com-

manded to serve. The sheriff would have been civilly. liable if he had refused to make a legal levy, which in our opinion, he was attempting to do when defendant shot him, without any justification.

The cause was fairly submitted to the jury, and we see no reason to disturb the verdict and judgment. Therefore, the judgment is affirmed.

*Affirmed.*

WILSON and HEBEL, JJ., concur.